UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

| | | |
|---|---|---|
| (1) TRILOGY SOFTWARE, INC., and (2) | § | |
| TRILOGY DEVELOPMENT GROUP, INC., | § | Case No.  2-04 CV-160 (TJW) |
| | § | |
| Plaintiffs, | § | Judge: Hon. T. John Ward |
| | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| | § | |
| (1) SELECTICA, INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |

**<u>SELECTICA, INC.'S OPENING CLAIM CONSTRUCTION BRIEF</u>**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................................... 1

II.  THE PATENTS AT ISSUE ........................................................................................... 1

    A.      Background to Configuration Technology........................................................... 1

    B.      Overview of the '822 Patent................................................................................ 3

    C.      Overview of the '609 and '077 Patents............................................................... 3

    D.      Overview of the '913 Patent................................................................................ 4

III. CANONS OF CLAIM CONSTRUCTION....................................................................... 4

    A.      Claim Construction Is A Question Of Law......................................................... 4

    B.      General Rules of Claim Interpretation................................................................ 5

    C.      Dictionaries May Aid To Show Ordinary Meaning of Claim Language.............. 5

    D.      Claims Are Generally Not Limited To Preferred Embodiments or

            Extraneous Limitations ....................................................................................... 6

    E.      Unambiguous Claim Terms Should Not Be Construed........................................ 7

    F.      Doctrine Of Claim Differentiation...................................................................... 8

    G.      Reliance on Extrinsic Evidence .......................................................................... 8

IV.  ARGUMENT.................................................................................................................. 9

    A.      Construction Of Disputed Terms........................................................................ 9

V.   CONCLUSION............................................................................................................... 21

# TABLE OF AUTHORITIES

## CASES

*3M Innovative Properties Co. v. Avery Dennison*,
350 F.3d 1365 (Fed. Cir. 2003) .........................................................................5

*Amhil Enterprise ltd. v. Wawa, Inc.*,
81 F.3d 1554 (Fed. Cir. 1996) .......................................................................6, 20

*ASM Amer., Inc. v. Genus, Inc.*,
260 F. Supp. 2d 827 (N.D. Cal. 2002) .................................................................7

*Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc.*,
262 F.3d 1258 (Fed. Cir. 2001) ...........................................................................5

*CardioGenesis Corp. v. PLC Med. Sys., Inc.*, 1998 WL 856088 (N.D. Cal. Dec. 2, 1998) ...........7

*Comark Communications, Inc. v. Harris Corp.*,
156 F.3d 1182 (Fed. Cir. 1998) ...........................................................................8

*Digital Biometrics, Inc. v. Identix, Inc.*,
149 F.3d 1335 (Fed. Cir. 1996) ...........................................................................5

*Dow Chem. Co. v. United States*,
226 F.3d 1334 (Fed. Cir. 2000) ...........................................................................8

*E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*,
849 F.2d 1430 (Fed.Cir. 1988) ...........................................................................7

*Hoganas AB v. Dresser Industries, Inc.*,
9 F.3d 948 (Fed. Cir. 1993).................................................................................7

*IXYS Corp. v. Advanced Power Tech, Inc.*,
301 F. Supp. 2d 1065 (N.D. Cal. 2004) ...............................................................7

*Karlin Tech., Inc. v. Surgical Dynamics, Inc.*,
177 F.3d 968 (Fed. Cir. 1999) .............................................................................8

*Kemco Sales, Inc. v. Control Papers Co.*,
208 F.3d 1352 (Fed. Cir. 2000) ...........................................................................8

*Key Pharmaceuticals v. Hercon Laboratories Corp.*,
161 F.3d 709 (Fed. Cir. 1998) .............................................................................9

*Kraft Foods, Inc. v. International Trading Co.*,
203 F.3d 1362 (Fed. Cir. 2000) .........................................................................22

*K-Z Corp. v. Salomon S.A.*,
    191 F.3d 1356 (Fed. Cir. 1999) ...............................................................................6

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004) ..................................................................................6

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
    355 F.3d 1361 (Fed. Cir. 2004) ........................................................................ 7, 8, 14

*Mallinckrodt, Inc. v. Masimo Corp.*,
    254 F. Supp. 2d 1140 (C.D. Cal. 2003) ....................................................................7

*Markman v. Westview Instruments Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd.*, 517 U.S.
    370 (1996) ................................................................................................................4

*Netword, LLC v. Centraal Corp.*,
    242 F.3d 1347 (Fed. Cir. 2001) ................................................................................4

*Nikon Corp. v. ASM Lithography*,
    308 F. Supp. 2d 1039 (N.D. Cal. 2004) .............................................................. 7, 8, 14

*Renishaw PLC v. Marposs Societa' Per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998) ............................................................................5, 7

*SRI Int'l. v. Matsushita Elec. Corp.*,
    775 F.2d 1107 (Fed. Cir. 1985) ................................................................................6

*Superguide Corp. v. DirecTV Enterprises, Inc.*,
    358 F.3d 870 (Fed. Cir. 2004) ..................................................................................6

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002) ............................................................................5, 6

*Texas Digital v. Telegenix, Inc.*,
    308 F.3d 1193 (Fed. Cir. 2002) .........................................................................passim

*Verizon Cal., Inc. v. Ronald A. Katz Tech. Licensing, L.P.*,
    326 F. Supp. 2d 1060 (C.D. Cal. 2003) ....................................................................8

*Vitronics Corp. v. Conceptronics, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ..............................................................................5, 8

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*,
    239 F.3d 1225 (Fed. Cir. 2001) ................................................................................8

# I.      INTRODUCTION

Defendant and Counterclaimant Selectica, Inc. ("Selectica") respectfully submits this opening brief on claim interpretation for U.S. Patent Nos. 6,049,822 ("the '822 patent"), 6,233,609 B1 ("the '609 patent"), 6,460,077 B2 ("the '077 patent") and 6,535,913 B2 ("the '913 patent") (collectively "Selectica patents") asserted in this action.  Copies of these patents are attached to the Declaration of Rick Chang in support of this opening brief ("Chang Decl.") as Exhibits 1-4 respectively.

Many of the allegedly disputed terms with respect to the Selectica patents – such as "selecting," "viewing," "ordering" and "application" – are easily understood and should have resulted in an agreement between the parties that the terms do not need construction or at most require a simple and plain definition.  However, Trilogy would not agree to simple and plain definitions.  Instead, Trilogy seeks to use these terms to read in extraneous limitations that are neither supported by the terms' ordinary meanings or by any special usage in the patents.

Other, more technical terms at issue – such as "object model," "GUI object model," "software engine," "applet" and "WEB-browser plug-in" – have common meanings understandable to persons of ordinary skill in the art.  Whereas Selectica's proposed definitions are consistent with the understanding of those of ordinary skill in the art, Trilogy's goal is to include unsupportable and irrelevant limitations solely for the purpose of creating noninfringement defenses.

For the reasons explained below, Selectica requests the Court to adopt its proposed constructions.

# II.     THE PATENTS AT ISSUE

## A.      Background to Configuration Technology

The patents-at-issue generally relate to what is known as configuration technology. Today, there is a growing demand for use of configuration technology on the Internet.  The Internet contains on-line information and shopping websites where vendors place products or services on-line for consumers to view, configure and/or order for inspection or purchase.  For

example, in configuring and ordering a car on-line, a consumer or end-user may choose from various models or submodels, select from different engine sizes, and choose what upgrades or accessories are to be included in his or her desired vehicle. This process of selecting from requirements, choices and/or options is known as configuration of a product.

Configuration options may include many interdependencies amongst the options. For example, to select a premium stereo system, a user of a car configurator may be required to select leather seats; or to get a certain color, the user may be limited to certain models. Unfortunately, these choices and options are not always apparent to a user and, quite often, there are hundreds or thousands of possible solutions. A user may have to try different combinations of selections before realizing a desired combination. The goal of configuration software is to assist the user in interactively navigating through the configuration process by presenting choices and options and allowing the user to make proper selections, ultimately achieving a configured product that contains valid combinations of requirements and options.

Configuration systems generally have at least two stages – a maintenance stage and a configuration stage. The maintenance stage allows a seller or configuration administrator to define, manipulate or update a knowledge base ("KB"). The KB can be thought of as a knowledge repository in which product and part information is stored and organized. Products and parts may have special features and/or configuration rules or constraints that are organized in the KB. The configuration stage subsequently allows the consumer or end-user to customize a product through a graphical user interface, which interfaces with the KB.

Configuration programs have been around since at least the 1980s. However, as technology and the Internet quickly advanced, older configuration systems could not keep up with new hardware and software requirements to satisfy online commercial configuration needs. New technological concerns included compatibility of configuration systems for use on multiple platforms, connectivity and efficiency issues for providing the configuration software over networks, and incompatibility with newer devices. Selectica's patented technology addressed these technological concerns. The patents-at-issue will be discussed in turn below.

2

**B.     Overview of the '822 Patent**

While use of knowledge bases in configuration technology was gaining in popularity in or around 1997, its applicability was faced with particular difficulties.  Knowledge-based programming was language-dependent and not easily transferred across different platforms (e.g., IBM to Macintosh to new versions of operating systems).  This language and platform dependency restricted its ability to broadly reach the quickly growing on-line community.

Selectica's '822 patent solved these problems.  The '822 patent describes methods and apparatuses wherein the knowledge base can be transportable across divergent types of computer platforms and languages.  Specifically, a preferred embodiment of the '822 patent is directed to a method for transmitting a knowledge-base object model from a source platform to a recipient platform via a data network.  First, the object model is converted into a first human-readable text file at the source platform.  This first text file may be used to create a GUI (graphical user interface) object model, which is converted into a second human-readable text file.  These first and second text files are then transported across the data network from the source platform to the recipient platform, where the object models are reconstructed.

**C.     Overview of the '609 and '077 Patents**

Prior to Selectica's '609 and '077 patents, a consumer or client interacting with configuration websites was required to download the KB and the KB configuration software in order to configure a product.  Downloading the entire program and KB was time consuming and utilized a great deal of the client-side resources.  As such, a goal was to keep software downloading to a minimum and to develop an executable interface that would allow a client to configure a KB and transact an order without being required to download the entire KB software to configure the KB.

Selectica's '609 and '077 patents solved these problems.  The '609 and '077 patents describe methods of interacting with and configuring knowledge bases presented over a wide area network via a remote computer or shared network connection.  For example, a preferred embodiment of the '609 patent enables a knowledge-based object model located at a server

3

platform to be configured from a client platform via a data network.  First, an object model and a configurator are set up at the server platform.  Second, a GUI user-interface application, which is capable of manipulating the configurator over the network, is transported from the server platform to the client platform.  Third, the client uses the GUI user-interface application to configure the object model at the server from the client platform.

### D.     Overview of the '913 Patent

With ever-advancing technology, new standalone Internet-capable devices are being developed to perform many WEB-based operations heretofore only possible from relatively more powerful desktop computers.  These devices are vast and varied.  Specifically, some such devices have low-bandwidth, some may have less user-interface capabilities, some may be portable, and some may include any combination of such features.  Such standalone Internet-capable appliances have been referred to as a light client or thin client.  The ultimate challenge was to allow all these different types of standalone Internet-capable appliances to quickly and efficiently interact with the on-line sales and service configuration systems.

Selectica's '913 patent describes methods and apparatuses for enabling standalone Internet-capable devices to interactively connect with sales and service systems to allow them to configure products and services.

### III.    CANONS OF CLAIM CONSTRUCTION

### A.     Claim Construction Is A Question Of Law

Claim construction is a question of law reserved exclusively for the court.  *Markman v. Westview Instruments Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd.*, 517 U.S. 370 (1996).  Federal courts are required to resolve disputes regarding how terms and phrases in patent claims should be construed.  *See id.*  "The role [of claim construction] is neither to limit nor to broaden the claims, but to define, as a matter of law, the invention that has been patented." *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001).

### B.      General Rules of Claim Interpretation

In construing claims, "the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification, and . . . the prosecution history . . . . Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001), quoting *Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). In analyzing the intrinsic evidence, "[t]he actual words of the claim are the controlling focus." *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1996). Courts should being with the claim language to define the scope of the patented invention, giving claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art. *See Texas Digital v. Telegenix, Inc.*, 308 F.3d 1193, 1201-2 (Fed. Cir. 2002); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002). "Absent a special and particular definition created by the patent applicant, terms in a claim are to be given their ordinary and accustomed meaning." *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998). Accordingly, "[t]he terms used in the claims bear a 'heavy presumption' that they mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art." *Texas Digital*, 308 F.3d at 1202; *3M Innovative Properties Co. v. Avery Dennison*, 350 F.3d 1365, 1370 (Fed. Cir. 2003). "[T]he presumption in favor of a dictionary definition will be overcome where the patentee, acting as his or her own lexicographer, has clearly set forth an explicit definition of the term different from its ordinary meaning" in the specification, claims or prosecution history. *Texas Digital*, 308 F.3d at 1204; *3M Innovative Properties*, 350 F.3d at 1371.

### C.      Dictionaries May Aid To Show Ordinary Meaning of Claim Language

Although not "intrinsic evidence," the Federal Circuit has held that "[d]ictionaries, encyclopedias, and treatises . . . are objective resources that serve as reliable sources of information on the established meanings that would have been attributed to the terms of the claims by those of skill in the art." *Texas Digital*, 208 F.3d at 1202-3. Dictionaries and treatises

"are unbiased reflections of common understanding not influenced by expert testimony or events subsequent to the fixing of the intrinsic record by the grant of the patent, not colored by the motives of the parties, and not inspired by litigation." *Id.* at 1203.

"If more than one dictionary definition is consistent with the use of the words in the intrinsic record, the claim terms may be construed to encompass all such consistent meanings." *Texas Digital*, 208 F.3d at 1203.  Where multiple dictionary definitions are cited, the intrinsic record "must always be consulted to identify which of the different possible dictionary meanings of the claim terms in issue is the most consistent with the use of the words by the inventor." *Id.*

### D.   Claims Are Generally Not Limited To Preferred Embodiments or Extraneous Limitations

The specification is an important tool in claim construction.  "The written description, however, is not a substitute for, nor can it be used to rewrite, the chosen claim language. 'Specifications teach.  Claims claim.'" *Superguide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004); *K-Z Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead we give effect to the terms chosen by the patentee.")  The Federal Circuit "has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to the embodiment." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898 (Fed. Cir. 2004); *Teleflex*, 299 F.3d at 1327. "Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim*, 358 F.3d at 906 (citing *Teleflex*, 299 F.3d at 1327).  "A preferred embodiment . . . is just that, and the scope of the patentee's claims is not necessarily or automatically limited to the preferred embodiment." *Amhil Enterprise ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1561 (Fed. Cir. 1996).  An inventor is not required to describe in the specification every means for utilizing an invention. *See SRI Int'l. v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).

Just as claims are generally not limited to preferred embodiments, "[i]t is improper for a court to add 'extraneous' limitations to a claim, that is, limitations added 'wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim.'" *Hoganas AB v. Dresser Industries, Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993), quoting *E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1433, (Fed.Cir. 1988). Indeed, if the Court does not need to rely on a limitation to interpret what a patentee meant by a particular term or phrase in a claim, "that limitation is 'extraneous' and cannot constrain the claim." *Renishaw*, 158 F.3d at 1249.

### E.    Unambiguous Claim Terms Should Not Be Construed

"Where claim language conduces to ready explication, the Federal Circuit has long reminded, courts should construe claim terms to mean precisely what they say." *Nikon Corp. v. ASM Lithography*, 308 F. Supp. 2d 1039, 1061 (N.D. Cal. 2004), *see also Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 355 F.3d 1361, 1368 (Fed. Cir. 2004) (vacating construction where the meaning of the claim language was clear). "Because the claim term's meaning is apparent on its face, the court need not venture far from the claim language itself." *Nikon*, 308 F. Supp. 2d at 1072. "Courts do not rewrite claims; instead we give effect to the terms chosen by the patentee." *K-Z Corp.,* 191 F.3d at 1364; *see also ASM Amer., Inc. v. Genus, Inc.*, 260 F. Supp. 2d 827, 850 (N.D. Cal. 2002) ("The Court agrees with ASM that there is no better way to define "generally circular" than to simply say "generally circular." Accordingly, the Court declines to construe the term."); *IXYS Corp. v. Advanced Power Tech, Inc.,* 301 F. Supp. 2d 1065, 1087 (N.D. Cal. 2004) ("The meaning of that three word term is apparently sufficiently well-established among those skilled in the art that this court need not clarify it further"); *CardioGenesis Corp. v. PLC Med. Sys., Inc.*, 1998 WL 856088, at *5 (N.D. Cal. Dec. 2, 1998) (declining to construe "marker pulse circuit" and stating that "the Court agrees with PLC that the term can be interpreted according to its plain meaning and need not be construed."); *Mallinckrodt, Inc. v. Masimo Corp.*, 254 F. Supp. 2d 1140, 1151-52 (C.D. Cal. 2003) (holding that various claim terms did not require construction); *Verizon Cal., Inc. v. Ronald A. Katz Tech. Licensing, L.P.*, 326 F.Supp.2d 1060,

1081 (C.D. Cal. 2003) (holding construction not necessary where language of the claim is clear).

Courts should only look "to the written description for guidance 'when the claim language itself lacks sufficient clarity to ascertain the scope of the claims.'"  *Liquid Dynamics*, 355 F.3d at 1367 ("[c]ourts construe claims by considering the evidence necessary to resolve disputes about claim terms and to assign a fixed, unambiguous, legally operative meaning to the claim."). "The Federal Circuit has long cautioned courts from positing constructions that 'contribute nothing but meaningless verbiage to the definition.'"  *Nikon*, 308 F. Supp. 2d at 1072.

### F.     Doctrine Of Claim Differentiation

The doctrine of claim differentiation holds that each claim in a patent is presumptively different in scope.  *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998); *Dow Chem. Co. v. United States*, 226 F.3d 1334, 1341-42 (Fed. Cir. 2000); *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999).  The doctrine of claim differentiation applies when there is a dispute over whether a limitation found in a dependent claim should be read into an independent claim, where that limitation is the only meaningful difference between the two claims.  *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001).  Thus, where a dependent claim recites a function separate and distinct from the function in an independent claim, the doctrine of claim differentiation indicates that those claims are different in scope.  *Id.*; *see, e.g.*, *Kemco Sales, Inc. v. Control Papers Co.,* 208 F.3d 1352 (Fed. Cir. 2000).

### G.     Reliance on Extrinsic Evidence

To ascertain the meaning of an asserted claim, a court first looks to "intrinsic" evidence, *i.e.*, dictionary definitions, the language of the claim, the patent specification, and the file history, as set forth above.  *Texas Digital*, 308 F.3d at 1202-04.  Ordinarily, intrinsic evidence should be sufficient to resolve any ambiguities and to determine the meaning of any disputed claims. *Vitronics*, 90 F.3d at 1582-83.  However, a court may consider "extrinsic" evidence (*e.g.*, expert testimony or inventor testimony).  *Id.*  Expert testimony on the proper construction of a disputed claim term "may only be relied upon if the patent documents, taken as a whole, are insufficient

to enable the court to construe disputed claim terms." *Id.* at 1585. Such expert testimony cannot vary or contradict the intrinsic evidence. *See id.* at 1584-85. Expert testimony can, however, always be considered by the Court "for background and education on the technology" at issue. *Key Pharmaceuticals v. Hercon Laboratories Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998).

## IV.   ARGUMENT

### A.   Construction Of Disputed Terms

#### 1.   "non-binary text file"

Selectica's Proposal:   A text file suitable for transmission over any network between different types of computers using different operating systems and languages.

Trilogy's Proposal:   A file consisting of nothing but standard ASCII characters (with no control codes or characters from the extended character set) that represents all of the objects in the object model and all of the relationships between those objects.

The term "non-binary text file" is recited in claims 1 and 4 of the '822 patent. The proper construction in light of its usage in the patent is *a text file suitable for transmission over any network between different types of computers using different operating systems and languages*. The specification explains that text files are commonly referred to as flat files, and that such files are human readable, and thus can be "transported to the client over the Internet or another type of network." Chang Decl. Exh. 1 ('822 Col. 3:35-36). The non-binary human readable format of these files "allows for the transporting of such information across different computer platforms as well as allowing for use on differing languages." Chang Decl. Exh 1 ('822 Col. 3:57-59). Thus, the definition proposed by Selectica is appropriate in light of the characterizations described in the specification and is consistent with its normal usage by one or ordinary skill in the art. Declaration of Arthur Keller ("Keller Decl.") at ¶ 2.

Trilogy, on the other hand, seeks to add limitations that are not supported by the claim language, specification or prosecution history. First, Trilogy claims that the definition should include an arbitrary parenthetical limitation "(with no control codes or characters from the

extended character set)."  This parenthetical is not supported by any of Trilogy's citations.

Indeed, Trilogy's expert, Dr. Peter Alexander, could not adequately justify or explain the

proposed addition of this limitation.  Chang Decl. Exh. 5 (Alexander Tr. at 67:10-19).

Second, Trilogy seeks impose a requirement that the ASCII files must represent "<u>all of
the objects</u> in the object model and all of the relationships between those objects" (emphasis

added).  Trilogy's inclusion of the words "all of the objects" requires that each individual text

file contain all of the objects of the object model, a limitation not supported by the claim, and

one that is not even discussed in preferred embodiments or the prosecution history.  Claim 1

plainly states that the text file represents "objects and object relationships."  The words "all of"

does not appear in the claim, nor should they be read in.  Moreover, Dr. Alexander could not find

a single instance in the intrinsic evidence supporting Trilogy's position.  Chang Decl. Exh. 5

(Alexander Tr. at 51:14-22; 55:15-21; 58:5-13; 59:2-7).  Dr. Alexander even admitted that it is

quite possible for the object model to be divided among <u>many</u> text files.  Chang Decl. Exh. 5

(Alexander Tr. at 61:10-14; 63:2-12).  There is simply no justification for including the phrase

"<u>all of the objects</u> in the object model and all of the relationships between those objects" as a

limitation for each text file.  Trilogy's construction should therefore be rejected.

### 2. "multimedia files"

<u>Selectica's Proposal</u>:   Files that contain one or more media of communication.

<u>Trilogy's Proposal</u>:    Files that contain more than one medium of communication.

The term "multimedia files" is recited in claims 1, 2, 3 and 4 of the '822 patent.  One of

ordinary skill would understand that this term to mean *files that contain one or more media of
communication*.  *See* Chang Decl. Exh. 6 (Systems Analysis and Design at 590); Keller Decl. ¶

3.  "Multimedia is a term coined to collectedly describe any information presented in a format

other than traditional numbers, codes, and words.  This includes graphics, sound, pictures, and

animation."  Chang Decl. Exh. 6 (Systems Analysis and Design at 590); Keller Decl. ¶ 3.  As the

term multimedia is commonly used, at least one of these forms of media, with the possible

addition of text, is sufficient to constitute a multimedia file.  Keller Decl. ¶ 3.

In contrast, Trilogy's definition requires that "multimedia files" include <u>more than one</u> medium of communication.  Trilogy's definition is not supported by the claim language, the specification or prosecution history.  Nor is it consistent with the normal usage of "multimedia files" by a one of ordinary skill.  *See* Keller Decl. ¶ 3; Chang Decl. Exh 5 (Alexander Tr. at 69:14-70:7); Chang Decl. Exh. 6 (Systems Analysis and Design at 590).  Indeed, the parties' experts, Dr. Keller and Dr. Alexander, agree that a file containing any <u>one</u> of the above listed media of communication by itself would constitute a multimedia file.  Keller Decl. ¶ 3;  Chang Decl. Exh 5 (Alexander Tr. at 69:14-70:7).  For example, Dr. Alexander admitted that a file containing only music or a file containing only an MPEG video clip is a multimedia file even though it only has one medium of communication.  *See id.*  Thus, "more than one" is not required.  Trilogy's construction should therefore be rejected.

> **3.      "object model"**

<u>Selectica's Proposal</u>:  A model representing objects and relationships between those objects.

<u>Trilogy's Proposal</u>:     A complicated model representing objects and relationships between those objects including all of the information related to the objects.

One of ordinary skill would understand an "object model" to be *a model representing objects and relationships between those objects*.  Keller Decl. ¶ 4.  Trilogy agrees with this definition, but seeks to add additional limitations that are not supported by any intrinsic evidence.  First, Trilogy defines the object model as "a complicated model . . . ."  The use of the word "complicated" comes from a statement made in the '822 prosecution history, to wit, "[t]he object model is a complicated model having both objects and relationships between those objects."  *See* Chang Decl. Exh. 7 ('822 Pros. Amendment A at 6).  "Complicated" is meaningless verbiage, not a defining element for the term "object model."  In the prosecution history, "complicated" was used merely as a point of reference to differentiate how object model files were complicated <u>relative</u> to HTML files.  *See id.*  It would be inappropriate to use such a descriptor as part of a definition for "object model", as it would have no point of reference or any context from which to derive a meaning.  "Complicated" simply adds nothing meaningful to the

definition of "object model."   Even Trilogy's expert, Dr. Alexander, admits that he would not use the word "complicated" to describe an object model.  Chang Decl. Exh. 5 (Alexander Tr. at 82:24-83:4)

Second, Trilogy seeks to read in the phrase, "including all of the information related to the objects" into the definition of "object model" from preferred embodiments.  There is no basis to limit "object model" to preferred embodiments.  Indeed, Dr. Alexander admitted that his understanding of "object model" is merely "*an abstract representation of relationships and attributes of classes of objects*."   Chang Decl. Exh. 5 (Alexander Tr. at 71:12-15).  Trilogy's proposal to include all information related to an object model is conspicuously missing from Dr. Alexander's understanding of object model.

### 4.    "GUI object model"

Selectica's Proposal:  An object model for the GUI.

Trilogy's Proposal:    An object model including graphical user interface (GUI) objects and all relationships between those GUI objects.

The term "GUI object model"[1] is found in claims 1 and 4 of the '822 patent.  The definition for this term should be *an object model for the GUI*.  This definition is supported by its usage in the specification.  Keller Decl. ¶ 5.

In its proposed construction, Trilogy sets forth a limitation that is not supported by the specification or prosecution history.  Specifically, Trilogy contends that the limitation "including . . . all relationships between those GUI objects" should be read into the definition of "GUI object model."  Trilogy's overt objective is to provide a parallel construction to the term "object model."  However, it does so by adding a description not supported in the specification.  The patent does not illustrate or necessitate "relationships between the GUI objects."  Keller Decl. ¶ 5.  Even Dr. Alexander admits that "relationships between the GUI objects" is not discussed in the patent.  Chang Decl. Exh. 5 (Alexander Tr. at 87:4-8).

---

[1] GUI is short for Graphical User Interface.

The concept of "relationships between the objects" is confined to the object model, not the GUI object model.  Keller Decl. ¶ 5.  The GUI object model serves the purpose of modeling the GUI objects as they relate to the objects of the object model, not to other GUI objects.  *See id.*  Trilogy's attempt to impose extraneous limitations, wholly unsupported and wholly unnecessary to the definition of "GUI object model" should be rejected.

### 5.       "software engine"

Selectica's Proposal:   A portion of a software program that determines how that program manages and manipulates data.

Trilogy's Proposal:     A configurator.

The term "software engine" is found in claims 3 and 4 of the '822 patent.  The ordinary meaning is appropriate for this term: *a portion of software program that determines how that program manages and manipulates data.  See* Chang Decl. Exh. 8 (Microsoft Computer Dictionary, Fifth Edition, at 193).

Trilogy provides no definition for software engine.  Instead, it attempts to impute <u>an example</u> of software that includes a software engine, "a configurator," as the definition for this term.  An example is not a definition.  Nor is a software engine necessarily a configurator.  Even Dr. Alexander concedes that the specification of the patent never defined "software engine" as a configurator.  Chang Decl. Exh. 5 (Alexander Tr. at 97:21-98:1).  Trilogy's position should therefore be rejected.

### 6.       "selecting" and "viewing"

Selectica's Proposal:   Construction not required.

Trilogy's Proposal:     Select and view without further interaction with the source platform.

The terms "selecting" and "viewing" are found in claims 3 and 4 of the '822 patent.  The trier of fact will readily comprehend the meaning for these terms.  "Where claim language conduces to ready explication, the Federal Circuit has long reminded, courts should construe claim terms to mean precisely what they say."  *Nikon Corp. v. ASM Lithography*, 308 F. Supp. 2d 1039, 1061 (N.D. Cal. 2004); *see also Liquid Dynamics*, 355 F.3d at 1368 (vacating

construction where the meaning of the claim language was clear).  Thus, "selecting" and "viewing" do not require construction.

Trilogy does not provide a definition, rather it attempts to introduce a new limitation through the terms "selecting" and "viewing."  Trilogy contends that "selecting" and "viewing" each must be limited by the phrase, "without further interaction with the source platform."  The ordinary meaning of "selecting" and "viewing" do not require "selecting" or "viewing" "without further interaction with the source platform."  Nor does the specification or file history require "selecting" or "viewing" in such a manner.  Trilogy is merely attempting to use "selecting" and "viewing" to read in entirely new limitation not present in claims 3 or 4.  The terms "selecting" and "viewing" simply do not require construction.

### 7.    "application"

Selectica's Proposal:  A computer program that performs some desired function.

Trilogy's Proposal:    A computer program, other than an operating system, a utility, or a language, that is designed to allow an end-user to perform some specific task.

The term "application" is found in claims 1 and 5 of the '609 patent.  Selectica does not believe it is necessary to construe this term.  However, if the Court believes this term should be construed, the ordinary meaning should control – *a computer program that performs some desired function.  See* Chang Decl. Exh. 9 (IEEE 100, the Authoritative Dictionary of IEEE Standards Terms, Seventh Edition, at 46).

Trilogy seeks to read in the phrase "other than an operating system, a utility, or a language" into the definition of "application."  There is simply no basis to read in this limitation.  Trilogy's own dictionary definition does not support Trilogy's position.  Chang Decl. Exh. 8 (Microsoft Computer Dictionary at 24).  Even Trilogy's expert, Dr. Alexander, admits that certain "utilities" would be considered "applications" by persons of ordinary skill.  *See* Chang Decl. Exh. 5 (Alexander Tr at 99:20-21; 101:18-21).  Thus, Trilogy's proposed construction should be rejected.

8.     **"transporting, from the server platform to the client platform, a graphical user-interface (GUI) user-interface application capable of remotely manipulating the configurator"**

Selectica's Proposal:   Construction not required.

Trilogy's Proposal:     Transporting, from the server platform to the client platform, only a graphical user-interface (GUI) user-interface application.

The phrase "transporting from the server platform to the client platform, a graphical user-interface (GUI) user-interface application capable of remotely manipulating the configurator" is found in claim 1 of the '609 patent. This phrase does not require construction.

Trilogy proposes to re-write the claim language to add the word "only" in front of "a graphical user-interface (GUI) user-interface application." None of the claims, the specification, or the prosecution history support Trilogy's position. The claim requires an "object model <u>at the server</u>," a "configurator <u>at the server</u>" and "a graphical user-interface (GUI) user-interface application" transported to the client (emphasis added). Simply put, the configurator and object model remain at the server platform while the graphical user-interface (GUI) user-interface application is transferred to the client. The arguments made during prosecution reflect these recited claim elements. Trilogy's attempt to preclude *anything* other than "a graphical user-interface (GUI) user-interface application" from being transported to the client platform is an overreaching litigation-driven attempt to read more into the claim than was ever intended by the patentee. Trilogy's proposed construction should therefore be rejected.

9.     **"GUI user-interface application operating from a client platform"**

Selectica's Proposal:   No construction required.

Trilogy's Proposal:     An application executing on a client platform that generates a graphical user interface.

The phrase "GUI user-interface application operating from a client platform" is found in claim 5 of the '609 patent. This phrase does not require construction. Selectica believes that the meaning of this phrase can be plainly understood without construction.

15

Trilogy's proposal is inappropriate. Trilogy's improperly seeks to substitute the actual claim language with "an application executing on a client platform that generates a graphical user interface." Specifically, where "operating" appears in the claim, Trilogy improperly substitutes "executing" in an effort to narrow the scope of the claim. There is simply no basis for this re-writing of the claim language. Also, Trilogy's attempt to <u>add</u> the phrase "that generates a graphical user interface" (rather than actually construing the language of the claim) is improper. This phrase does not appear in the claim and there is no legal basis to add it. The Court should therefore reject Trilogy's proposed construction.

### 10.    "ordering," "placing an order," and "order"

<u>Selectica's Proposal</u>:  Construction not required.

<u>Trilogy's Proposal</u>:    Providing an instruction to buy something.

The terms "ordering," "placing an order" and "order" are found in claims 1 and 5 of the '609 patent, claims 6 and 12 of the '077 patent and claims 1 and 8 of the '913 patent. These terms do not require construction. The trier of fact will readily comprehend the plain meaning of "ordering," "placing an order," and "order."

Trilogy seeks to limit each of these terms to mean, "providing an instruction to buy something." The notion that something must be bought is not required by the claim, nor is it required by the ordinary understanding of "ordering" or "placing an order." The ordinary meaning of "ordering" <u>may</u> include the actual purchase of an item, but it is not required. *See* Chang Decl. Exh. 10 (Random House Webster's Collegiate Dictionary at 929). For example, a car may be ordered, but it need not be bought until after actual delivery and acceptance. Also, a service item may be ordered, but it need not be bought until the service has been completed.

The patentee could have claimed "an instruction to buy something," but did not. Trilogy's attempt to use "ordering" to re-write the claim and add the limitation "an instruction to buy something" is a litigation-driven construction that has no support in the intrinsic record and is not consistent with the ordinary meaning of theses  Therefore, Trilogy's construction should be rejected.

16

### 11.   "applet"

Selectica's Proposal:   A program that can be downloaded over the Internet and executed on the recipient's machine.

Trilogy's Proposal:   A program designed to be executed within another application.  Unlike an application, applets cannot be executed directly from the operating system.

The term "applet" is found in claims 1, 4, 6, 7, 10 and 12 of the '077 patent and claim 17 of the '913 patent.  This term should take its ordinary meaning – *a program that can be downloaded over the Internet and executed on the recipient's machine.  See* Chang Decl. Exh. 8 (Microsoft Computer Dictionary at 31).  There is no basis to construe "applet" more narrowly than its ordinary meaning.

Trilogy again seeks to add limitations not supported by the claim language, specification or prosecution history.  Specifically, Trilogy seeks to add the limitation "[u]nlike an application, applets cannot be executed directly from the operating system."  Trilogy cites extensively to the patents and prosecution history in the Joint Claim Construction Statement, but not a single cite reflects the limitation Trilogy seeks.  Indeed, technical dictionaries contradict Trilogy's proposals.  For example, the Dictionary of Computer and Internet Terms explains that most operating systems come with *several applets*, such as a calculator, a calendar, and a note editor. *See* Chang Decl. Exh. 11 (Dict. of Computer and Internet Terms at 21); *see also* Chang Decl. Exh. 9 (Microsoft Computer Dictionary at 31) ("a program that can be downloaded over the Internet and executed on the recipient's machine"); Exh. 10 (Random House Webster's Collegiate Dictionary at 66) ("a small application program that can be called up for use while working in another application").  "If more than one dictionary definition is consistent with the use of the words in the intrinsic record, the claim terms may be construed to encompass all such consistent meanings." *Texas Digital*, 208 F.3d at 1203.

One of ordinary skill in the art would understand that "applets" could be executed directly from an operating system.  Keller Decl. ¶ 6.  Thus, Trilogy's construction should be rejected.

### 12. "WEB-browser plug-in"

Selectica's Proposal:   A program that can be installed in a web-browser.

Trilogy's Proposal:     A program module that is designed to directly interface with, and give additional capability to, a WEB browser.

The term "WEB-browser plug-in" is found in claims 3 and 7 of the '609 patent and claims 4 and 10 of the'077 patent.   No special meaning has been attributed to "WEB-browser plug-in" in the patent.  To a person of ordinary skill in the art, "WEB-browser plug-in" means *a program that can be installed in a web-browser*.  Keller Decl. ¶ 8; *see also* Chang Decl. Exh. 8 (Microsoft Computer Dictionary at 409).

Trilogy seeks to impose limitations that are not supported by the claim language, specification and prosecution history.  First, Trilogy adds the phrase, "directly interface with" as part of its definition.  There is no reason to limit the plug-in to "directly interface" with the WEB-browser.  In fact, most technical dictionaries do not include this "directly interface" limitation when defining "plug-in."  *See, e.g.*, Chang Decl. Exh. 12 (Microsoft Computer Dictionary, Third Edition, at 370); Exh. 9 (IEEE 100, the Authoritative Dictionary of IEEE Standards Terms, Seventh Edition, at 46); Exh. 13 (Random House Webster's Computer & Internet Dictionary, Third Edition, at 434).  Trilogy further adds the phrase "give additional capability to" as part of its definition.  However, not all "plug-ins" provide additional capability to their hosts.  Keller Decl. ¶ 7.  Trilogy's proposed construction is unduly narrow and should be rejected.

### 13. "summary of the order," "summary of an original configuration" and "summary of a configuration"

Selectica's Proposal:   Ordinary meaning – construction not required.

Trilogy's Proposal:     A condensed form of a previously submitted order that does not contain high bandwidth or memory-dependent aspects of that order.

The terms "summary of the order," "summary of an original configuration" and "summary of a configuration" are found in claims 1, 8 and 17 of the '913 patent.  These terms

are readily understood by the trier of fact and do not require construction.

Trilogy seeks to re-write these claim elements in their entirety.  In particular, Trilogy seeks to replace "summary" with "condensed form of a previously submitted order."  There is no legitimate reason for this substitution.  The trier of fact will readily understand the term "summary."

Trilogy also seeks to restrict the "summary" from containing "high bandwidth or memory-dependent aspects of that order."  In doing so, Trilogy merely seeks to limit the claim to a description of a preferred embodiment.  Specifically, the patent states that the "use of the word summary *in this embodiment* means that high bandwidth and memory-dependant aspects of an original knowledgebase order are not present in a summary of such an order."  *See* Chang Decl. Exh. 4 ('913 Patent, Col. 11:57-60) (emphasis added).  "A preferred embodiment . . . is just that, and the scope of a patentee's claims is not necessarily or automatically limited to the preferred embodiment."  *Amhil Enterprises*, 81 F.3d at 1561.  Trilogy's attempt to impose preferred embodiments into the claim construction should be rejected by the Court.

### 14.    "light client"

<u>Selectica's Proposal</u>:  Standalone internet-capable appliance.

<u>Trilogy's Proposal</u>:    A portable communication device that has less user interface and
                          bandwidth capabilities than a personal computer.

The term "light client" is found in claims 3, 4, 5, 11, 12, 13, 19, 20 and 21 of the '913 patent.  Here the patentee has explicitly defined the light client as a "standalone Internet-capable appliance."  *See* Chang Decl. Exh. 4 ('913 Patent, Col. 3:12-15).  "[T]he presumption in favor of a dictionary definition will be overcome where the patentee, acting as his or her own lexicographer, has clearly set forth an explicit definition of the term different from its ordinary meaning" in the specification, claims or prosecution history."  *Texas Digital*, 308 F.3d at 1204.  "Light-client" should therefore be construed consistent with the patentee's definition.

Ignoring the definition set forth by the patentee in the specification, Trilogy seeks to add limitations that are not supported by the claim language, specification or prosecution history. Trilogy's proposed construction includes three improper limitations: that the light client (1) be "portable," (2) have "less user interface" and (3) have less "bandwidth capabilities than a personal computer." There is no support in the intrinsic record for Trilogy's proposed limitations. Indeed, when asked whether a light client is restricted to portable devices, Dr. Alexander conceded that the description of portability was nowhere to be found in the specification or prosecution history. *See* Chang Decl. Exh. 5 (Alexander Tr. at 144:16-145:21; 147:8-21). Dr. Alexander further concedes that the '913 specification does not explicitly require that a light client device must have both limited bandwidth and limited interface capabilities at the same time. *See* Chang Decl. Exh. 5 (Alexander Tr. at 149:17-150:7). In view of the patentee's explicit construction of light-client and the fact that Trilogy's proposed construction is not supported, Trilogy's proposal should be rejected.

## 15.   "dedicated"

<u>Selectica's Proposal</u>:  Construction not required.

<u>Trilogy's Proposal</u>:    Committed entirely to a single purpose.

The term "dedicated" is found in claims 6 and 7 of the '913 patent. This term is readily understandable and does not require construction.

Trilogy seeks to restrict "dedicated" to mean "committed entirely to a single purpose." Dedication does not require an entire commitment to a single purpose. Nor does the claim language, specification, the prosecution history, or even Trilogy's own dictionary support this construction.

### 16.   "client-side communication device" or "client device"

<u>Selectica's Proposal</u>:   Device used by the client.

<u>Trilogy's Proposal</u>:     A light client.

The terms "client-side communication device" and "client device" are found in claims 1, 8 and 17 of the '913 patent.  These terms are readily understood by one of ordinary skill in the art to mean *a device used by the client*.  Keller Decl. ¶ 9.

Trilogy's proposal improperly limits these terms to preferred embodiments and violates the principle of claim differentiation.  In particular, Trilogy defines client-side communication device as nothing more than the embodiment of a "light client."  This definition violates the doctrine of claim differentiation.  Dependent claim 3 states "wherein the user interface operates on a light client."  If the client-side communication device was just a light client, then limitation set forth in claim 3 would be redundant.  "Under the doctrine of claim differentiation, two claims of a patent are presumptively of different scope."  *Kraft Foods, Inc. v. International Trading Co.*, 203 F.3d 1362, 1366 (Fed. Cir. 2000).  As such, the definition for client-side communication device of claim 1 is presumed to be broader than just a "light client."  Trilogy cannot offer any legally sufficient basis for its narrow construction.

### V.    CONCLUSION

For the foregoing reasons, Selectica requests the Court to adopt its proposed claim constructions.

DATED:  July 1, 2005

Respectfully submitted,

By: /s/ Otis W. Carroll by permission Rick Chang
    Otis W. Carroll, Attorney-In-Charge
    State Bar No. 03895700
    IRELAND CARROLL AND KELLEY, P.C.
    6101 South Broadway, Suite 500
    P.O. Box 7879
    Tyler, Texas 75711
    Telephone:  (903) 561-1600

Facsimile:  (903) 581-1071
E-Mail:  fedserv@icklaw.com

S. Calvin Capshaw
State Bar No. 03783900
BROWN McCARROLL, L.L.P.
1127 Judson Road, Suite 220
P.O. Box 3999 (75606-3999)
Longview, Texas 75601-5157
Telephone:  (903) 236-9800
Facsimile:  (903) 236-8787
E-Mail: ccapshaw@mailbmc.com

Franklin Jones, Jr.
State Bar No. 00000055
JONES & JONES, INC., P.C.
201 West Houston Street (75670)
P. O. Drawer 1249
Marshall, Texas 75671-1249
Telephone:  (903) 938-4395
Facsimile:  (903) 938-3360
E-Mail:  franklinj@millerfirm.com

Henry C. Bunsow
California Bar No. 060707
K.T. Cherian
California Bar No. 133967
Scott Wales
California Bar No. 179804
Rick C. Chang
California Bar No. 209515
HOWREY LLP
525 Market Street, Suite 3600
San Francisco, California 94105
Telephone:  (415) 848-4900
Facsimile:  (415) 848-4999
E-Mail:  bunsowh@howrey.com
E-Mail:  cheriank@howrey.com
E-Mail:  waless@howrey.com
E-Mail:  changr@howrey.com

Attorneys for Defendant
SELECTICA, INC.

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the foregoing document has been sent to the following counsel of record by ECF and/or e-mail on July 1, 2005.

Sam Baxter
McKool Smith, APC
505 E. Travis, Suite 105
P.O. Box O
Marshall, Texas  75670
Tel:   903-927-2111
Fax:   903-927-2622

Mike McKool, Jr.
McKool Smith, APC
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Tel: 214-978-4000
Fax: 214-978-4044

Peter J. Ayers
McKool Smith, APC
300 W. 6th Street, Suite 1700
Austin, TX  78701
Tel:  512-692-8700
Fax:  512-692-8744

/s/ Rick  Chang
Rick Chang